## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROSIE SANDHU, YST INC., et al., | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
|       v. | ) Civ. No. 14-565-SLR |
| | ) |
| 7-ELEVEN, INC., | ) |
| | ) |
|       Defendant. | ) |

## **MEMORANDUM**

At Wilmington this 2nd day of June 2014, having reviewed the papers submitted

in connection with plaintiffs' motion for preliminary injunction, and having heard oral

argument on the same, the court issues its decision based on the reasoning that

follows:

1. **Background.** Plaintiff Rosie Sandhu, through her corporation YST, Inc.

(collectively, "plaintiffs"),[1] is franchised by 7-Eleven, Inc. ("7-Eleven") to operate a 7-

Eleven® convenience store located in Bear, Delaware ("the Store"). According to the

"7-Eleven, Inc. Individual Store Franchise Agreement" ("the Agreement") executed by

plaintiffs on or about June 3, 2013, in exchange for establishing and maintaining

financing[2] for a franchisee, 7-Eleven conducts quarterly audits, preserving the right to

---

[1]Also named as plaintiffs are the parents of Rosie Sandhu - Sakattar Singh
Sandhu and Paramjit Kaur Sandhu.

[2]Although franchisees are free to obtain their own financing for the operation of
the store, most franchisees (like plaintiffs) utilize 7-Eleven's financing. (D.I. 17, ¶ 10) In
order to secure financing, 7-Eleven is given a security interest in, among other things,
all of the present and thereafter acquired store inventory, and the proceeds thereof.
The amount financed by 7-Eleven and the balance due from the franchisee is

enter a store and conduct an audit

> at any time and without notice . . . if Net Worth is less than the
> Minimum Net Worth required under Paragraph 13(d); or (d) if the
> last Audit we conducted reflects an Inventory Overage or Inventory
> Shortage of more than one percent (1%) of the Retail Book Inventory.

(D.I. 3, ex. A, ¶ 14) The Agreement also provides in this regard that 7-Eleven agrees to

> finance any unpaid balance in the Open Account as a loan to you,
> provided that (1) you are not in Material Breach of this Agreement
> . . . . If at any time there has been a Material Breach by you or we
> believe that any of the conditions set forth above are not met or if
> we reasonably believe that our security interest is threatened, we
> may discontinue the financing described above. If we do so, you
> agree to immediately pay us the unpaid balance in the Open
> Account.

(*Id.* at ¶ 13(b))

   2. The Store commenced operation in August 2013. On March 31, 2014, 7-

Eleven conducted an unannounced audit at the Store. An inventory shortage (i.e.,

difference between the book and actual inventory) of more than $30,000 at cost was

recorded.[3] According to 7-Eleven, such shortage resulted in plaintiffs' "equity

investment in the Store falling significantly below the minimum required under" the

Agreement. (D.I. 15 at 2)

---

maintained in an account defined in the Agreement as the "Open Account," which
reflects (i) any initial inventory financed, as well as (ii) all subsequent purchases and
expenses financed through 7-Eleven and (iii) proceeds from all sales. Thus, the Open
Account essentially "is a running working capital account that at any particular point in
time reflects the outstanding balance of any unpaid sums that 7-Eleven has loaned or
advanced to the franchisee to operate the store." (D.I. 17, ¶ 11)

[3]According to the declaration of James Passarella, 7-Eleven's Director of Asset
Protection, East Operations, "[t]he unannounced audit of the . . . Store revealed an
alarmingly high inventory shortage of $49,242.58, at retail value. Although some
inventory variation is not uncommon, the average quarterly inventory shortage, at retail,
is typically no more than a few thousand dollars." (D.I. 16, ¶ 9)

2

3. Plaintiffs have characterized the March 31, 2014 audit as both "secretive" and "inappropriate."[4] (D.I. 4 at 5) Plaintiffs blame the poor audit results on the fact that the auditor had "installed himself as Rosie's *de facto* manager" with a mission to "sabotage the . . . Store, make its staff and Rosie uncomfortable and, ultimately, constructively terminate the" Agreement. (*Id.* at 3, 4) Plaintiffs assert that they, through the manager of the Store, "immediately disputed the results of the audit and requested a second audit." (*Id.* at 5)

4. Following the March 31, 2014 audit, 7-Eleven removed the Store's money order equipment and discontinued financing.[5] On May 12, 2014, 7-Eleven served a curable notice of material breach concerning the Store's failure to maintain the required minimum net worth as of April 30, 2014, with a termination date 90 days from receipt of the notice. (D.I. 15 at 3 n.3)

5. Although 7-Eleven has not yet terminated the Agreement and plaintiffs continue to have the option of curing the alleged material breach, plaintiffs filed the instant motion for injunctive relief on May 7, 2014. (D.I. 3) Plaintiffs claim that 7-Eleven has constructively terminated the Agreement by removing certain equipment and discontinuing financing, "effectively sounding the death knell of the business." (D.I. 4 at 6) According to plaintiffs,

> [i]f 7-Eleven's constructive termination is left unchecked, Rosie and

---

[4]As noted, the March 31, 2014 audit was unannounced. According to plaintiffs, the audit was "inappropriate" because "7-Eleven failed to include large sections of merchandise." (D.I. 4 at 5)

[5]Although 7-Eleven served two notices of material breach soon thereafter, they have since been withdrawn. (D.I. 15 at 2-3)

3

> YST will suffer irreparable harm. . . . Not only would Rosie lose her entire business, into which she has invested hundreds of thousands of dollars, but YST would be forced to terminate the employment of all of its employees, many of whom rely on their jobs to support their families. . . . Moreover, even a temporary closing of the . . . Store will diminish the good will it has earned in the community through Rosie's and YST's tireless efforts to be responsive to their customers' needs. Consequently, money damages will not be able to make [p]laintiffs whole.

(*Id.* at 7-8)

6. After suit was filed, 7-Eleven attempted to conduct a regularly-scheduled audit of the Store. Despite prior notifications reminding plaintiffs of the scheduled May 19, 2014 audit (D.I. 21, exs. A, B), and despite plaintiffs' request for a second audit following the March 31, 2014 audit, the audit was refused by personnel at the Store. (*Id.* at 3)

7. **Jurisdiction.** Plaintiffs assert that they are Delaware residents. (D.I. 1, ¶¶ 9-12) Defendant 7-Eleven is a Texas corporation, with its principal place of business at 1722 Routh Street, Suite 1000, Dallas, Texas. 7-Eleven is a wholly-owned subsidiary of a Japanese corporation and is the largest convenience store chain in the world, with 31,000 locations worldwide. (*Id.* at ¶¶ 2, 13) The court has jurisdiction pursuant to 28 U.S.C. § 1332.

8. **Standard of Review.** "The decision to grant or deny . . . injunctive relief is an act of equitable discretion by the district court." *eBay, Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006). The grant of a preliminary injunction is considered an "extraordinary remedy" that should be granted only in "limited circumstances." *See Kos Pharm., Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted). The

4

moving party for injunctive relief must establish: "(1) a likelihood of success on the

merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting

preliminary relief will not result in even greater harm to the nonmoving party; and (4)

that the public interest favors such relief." *Id.* (citation omitted). The burden lies with

the movant to establish every element in its favor or the grant of a preliminary injunction

is inappropriate. *See P.C. Yonkers, Inc. v. Celebrations, the Party and Seasonal*

*Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). If either or both of the fundamental

requirements – likelihood of success on the merits and probability of irreparable harm if

relief is not granted – are absent, an injunction cannot issue. *See McKeesport Hosp. v.*

*Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 523 (3d Cir. 1994).

9. Plaintiffs contend that the above standard does not apply in this case but,

rather, that Delaware's Franchise Security Law ("FSL") applies. Under the provisions of

the FSL, if a franchisor "unjustly terminates a franchise," the franchisee

> shall be entitled to recover damages from the franchisor and, in
> addition, shall be entitled to secure in the Court of Chancery of
> this State, subject to general equitable principles, an order
> enjoining such termination or, in case of a failure or refusal to
> renew, a mandatory order for renewal of the franchise. Pending
> the issuance of such an order, the franchised distributor shall be
> entitled to an order enjoining such termination pendente lite, or in
> case of a failure or refusal to renew, a mandatory order extending
> the franchise pendente lite.

6 Del. C. § 2553(a). There are very few decisions addressing the FSL. Nevertheless,

two principles pertinent to the instant case have not been challenged. First, the FSL

"does permit a cause of action for constructive or *de facto* termination," consistent with

the law's general purpose, which "is to remedy the imbalance of power in the franchise

5

relationship by adding a few statutory pounds to the franchisee's side of the scales."

*Kirkwood Kin Corp. v. Dunkin' Donuts, Inc.*, Civ. No. 94-03-189, 1997 WL 529587 (Del.

Super. Jan. 29, 1997).  Moreover, "in order to maintain the status quo pending a full

hearing, [a franchisee] must show some probability that [the franchisor] is attempting to

terminate their . . . relationship in bad faith or without just cause for doing so, regardless

of the language of their . . . contract[ ]."  *Paradee Oil Company, Inc. v. Phillips*

*Petroleum Company,* 320 A.2d 769, 775 (Del. Ch. 1974).

    10.  Under the facts of this case, I conclude that plaintiffs are not required to

show a likelihood of eventual success on the merits.  Consistent with the FSL, plaintiffs

must instead demonstrate "some probability" that 7-Eleven is attempting to terminate

the franchise relationship in bad faith or without just case for doing so.  Translating this

standard into perhaps a more familiar one, plaintiffs must carry their burden of proof by

a preponderance of the evidence, i.e., that it is more likely so than not that 7-Eleven is

constructively terminating the franchise in bad faith.

    11.  **Anaysis.**  The record from which I must make my determination consists of

the Agreement and several declarations.  For their part, plaintiffs presented the

declaration of plaintiff Rosie Sandhu in support of their motion (D.I. 3), and the

declaration of Ajay Mann in support of their reply brief (D.I. 19).  These two declarations

certainly contain troubling allegations, ranging from inappropriate sexual conduct by 7-

Eleven's auditor[6] to characterizing the March 31, 2014 audit as "secretive, incomplete

_____

    [6]I note for the record in this regard that, apparently, Rosie Sandhu actually
resides in California, not Delaware, and is not regularly present in the Store.  (D.I. 16, ¶
6)  In any event, there is no dispute that she designated her brother, Ajay Mann, to
oversee the operations of the Store.  (D.I. 19, ex. 2, ¶ 3)

and noncompliant." However, these declarations do little more than repeat the primary claims for relief, with no additional evidentiary support, that is: (1) the March 31, 2014 audit was conducted without any managers on site; and (2) 7-Eleven failed to include large sections of merchandise in the inventory. Despite the assertion of declarant Rosie Sandhu that the allegations set forth in the "Notice of Material Breach" will be disproven "once 7-Eleven conducts an appropriate review of [the Store's] records" (D.I. 3, ex. 1, ¶ 42), plaintiffs have neither permitted 7-Eleven to conduct such an audit nor have they arranged for an independent audit to be performed.

12. For its part, defendant 7-Eleven has submitted several declarations, including the declarations of James Passarella, the Director of Asset Protection, East Operations (D.I. 16); Janice Tangradi, the Market Manager for 7-Eleven's Philadelphia and Delaware regions (D.I. 17); and Kyle Palmer, the Field Consultant in Market 2408 (D.I. 18, 21). These declarations provide more detail about the Agreement and its requirements, as well as more detail about the results of the March 31, 2014 audit.

13. **Conclusion.** Although plaintiffs in their papers generally describe a "nationwide scheme to improperly intimidate and terminate term franchisees" (D.I. 4 at 8), the focus of the proceeding at bar is the March 31, 2014 audit of the Store and the events subsequent to that audit, all in the context of plaintiffs' burden to demonstrate that it is more probably true than not that 7-Eleven has constructively terminated the Agreement in bad faith or without just cause for doing so. I find that plaintiffs' have failed to carry their burden of proof in this regard.

14. Aside from the fact that the record is replete with conflicting declarations,

7

which at best[7] even the scales to favor neither plaintiffs nor defendant, the record contains not one scintilla of objective evidence to demonstrate that the audit was either inaccurate or conducted outside the scope of the Agreement. Indeed, whatever weight I might give to plaintiffs' allegation that 7-Eleven purposefully conducted the March 31, 2014 audit without any managers on site is counter-balanced by the fact that plaintiffs have declined to to allow a second audit, thus leaving the record characterized by conclusory allegations and no proof. I decline to issue injunctive relief on such an equivocal record.[8] An appropriate order shall issue.

United States District Judge

_____

[7]That is, without necessarily judging the credibility of the declarants.

[8]Because plaintiffs cannot prevail without demonstrating some probability of success on the merits absent extraordinary proof of harm, I do not spend much time on the remaining prongs of the preliminary injunction standard. Clearly the discontinuation of financing by 7-Eleven is a substantial hardship for plaintiffs, despite their freedom to operate without such financing. As a secured creditor, 7-Eleven has contractual rights provided for in the Agreement; its rights will be harmed if it were forced to resume financing until a final hearing, especially without the requirement that a substantial security deposit be made by plaintiffs. The public's interest lies somewhere in between these two positions. None of these prongs weigh so heavily in favor of plaintiffs that injunctive relief should issue under the circumstances at bar.

8